FILED

2025 Mar-31 PM 01:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| EARTHA M. TURNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:21-cv-1484-JHE |
| | ) | |
| JANET YELLEN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

On November 7, 2021, Plaintiff Eartha M. Turner ("Turner" or "Plaintiff") initiated this action against Defendant Janet Yellen in her role as Secretary of the Department of Treasury ("Treasury" or "Defendant"), alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, including the Civil Rights Act of 1991, 42 U.S.C. § 2000e, *et seq*. (Doc. 1). Treasury filed the pending Motion for Summary Judgment and supporting evidence on April 3, 2024. (Docs. 36, 37). Turner filed her response along with her own supporting evidence on April 30, 2024. (Docs. 40, 41). Treasury filed a reply brief on May 15, 2024. (Doc. 46).

While Treasury's Motion for Summary Judgment (doc. 37) was pending, Turner moved to strike the affidavits of Lori Watt ("Watt") and Sarah Ferree ("Ferree") (doc. 42). Treasury responded to the motion on May 15, 2024 (doc. 45) and simultaneously moved for leave to file

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 12.)

unredacted declarations under seal and substitute Ferree's declaration with that of Amanda Jackson (doc. 44). Turner did not file a reply brief regarding her motion to strike (doc. 42). She responded in opposition to Treasury's motion for leave to file unredacted declarations under seal on June 5, 2024, (doc. 49), and Treasury filed a reply on June 12, 2024 (doc. 50). The undersigned granted the motion to file unredacted declarations under seal. (Doc. 51).

In the following memorandum opinion, the undersigned addresses Treasury's Motion for Summary Judgment (doc. 37), Turner's Motion to Strike affidavits (doc. 42), and Treasury's motion to substitute Ferree's declaration with Amanda Jackson's (doc. 44). For the reasons set out below, the undersigned finds that Treasury's Motion for Summary Judgment (doc. 37) is due to be **GRANTED IN PART** and **DENIED IN PART**. Treasury's motion to substitute Ferree's declaration with Amanda Jackson's (doc. 44) is due to be **GRANTED**, and Turner's motion to strike (doc. 42) the Watt and Ferree declarations (substituted by the declaration of Amanda Jackson) is due to be **DENIED.**

## I. Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to

establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970). *See also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

### A. Turner's Employment History and Duties

Turner is currently and was at all relevant times an employee of the United States Department of Treasury. She has been employed in the Bureau of Fiscal Service's ("BSF") Debt Management Services ("DMS") branch in the Birmingham office ("DMS-East") since

approximately 2000. (Doc. 36-1 at 29:5-17; 31:8-13). Turner is a black woman and holds an associate degree in computer science from Southern Junior College of Business. (*Id*. at 10:7-12). She worked part-time in the DMS Call Center for 14 years and was a Grade ("GS") 7, Step 5 employee during that time. (*Id*. at 29:16-17; 37:16-19). In 2014, Turner was promoted to a full-time position as a Management and Program Analyst in the Administrative Wage Garnishment ("AWG") section of DMS and received a Grade increase to GS-9, Step 1, with a salary of $47,923. (*Id*. at 37:16-22). She is now a GS-9, Step 8 employee, earning between $70,000 and $72,000 per year. (*Id*. at 23:19-22; 37:25-38:5).

While Turner was working in AWG, her duties involved processing information within two primary categories: the employed and the no longer employed. (Doc. 36-1 at 98:19-25; 139:17-20). She processed the information into the system and indicated whether debtors were employed or not to assess eligibility for wage garnishment. (*Id*.) According to Turner, while GS-9s processed the information as to the employed versus the no longer employed, GS-11s generally worked on noncompliance, and GS-12s would generally work on hearings. (*Id*. at 139:17-20). Employees at the GS-9 level would occasionally work on noncompliance, but not regularly. (*Id*. at 98:22-99:2). Treasury policy states that employees are allowed to perform higher grade-level work for up to 25% of their work time. (Doc. 36-12 at 18:13-18; Doc. 36-7 at 20-23:2). Turner testified that doing work normally done by higher grade-level employees equated to training for a position at that grade-level. (*Id*. at 164:22-165:20).

DMS-East implemented a branch-wide reorganization in June of 2018 (the "Reorganization"). As part of the Reorganization, Turner and her co-worker Derrick Jackson ("Jackson") were transferred from AWG to the Disputes and Proof of Debt ("DPOD") section of

DMS. (Doc. 36-1 at 58:6-12; Doc. 36-5 at 107:2-6). Both Turner and Jackson were GS-9 employees at the time of the reorganization. (*Id*. at 58:6-15). She avers that the "decision to reorganize AWG was motivated by Turner and Jackson's participation in the EEO process." (*Id*. at 59:20-60:4). She has worked as a Management and Program Analyst in DPOD since 2018. (*Id*. at 114:10-12; 37:14-15). Since Turner has been at the Treasury, she has never been demoted and never received a salary decrease. (*Id*. at 106:5-12). She has applied for five GS-11 positions (in the Finance, UCC, and Correspondence sections of the DMS) since 2015. (*Id*. at 14:4-18:18; 21:23-23:18; 26:22-29:23; 43:8-44:10). She filed four of the five applications at least one year before her transfer from AWG to DPOD. (*Id*.) Turner would have to apply for and be selected for an open GS-11 position to be promoted from GS-9 to GS-11. (Doc. 36-7 at 34:11-23; 64:21-65:8). There have been no open GS-11 positions in AWG or DPOD since 2018. (*Id*. at 65:9-12).

Turner was approved for a compressed work schedule in 2018 after moving to DPOD. (Doc. 36-1 at 83:15-84:21). Beginning in approximately March 2020, she began teleworking and remains teleworking daily. (*Id*. at 88:1-89:7). Her general work duties include processing disputes and proofs of debt through approximately 8 queues and the FileNet system. (*Id*. at 91:5-94:13). Turner asked for a desk audit, requesting that her grade level be increased from a GS-9 to a GS-11 since, she argued, she was doing more work in DPOD than she had been in AWG. (Doc. 36-1 at 48:15-49:22). She and the other GS-9s in her group spoke with manager Kevin Jackson and Dan Vavasour, who was the Assistant Commissioner of DMS at the relevant time, about changing the grade level of the GS-9s in DPOD. (Doc. 36-1 at 15-49:14). Her grade level was not changed. (Doc. 36-1 at 47:18-24).

Turner preferred working in AWG to DPOD because AWG was "not as intense," and did not require "as much processing." (*Id*. at 99:19-100:12). She stated that, generally, "[i]t's just so much work, so much more that you have to do in DPOD than I was doing . . . in the AWG area." (*Id*.) She noted that "you do more thinking and you do more processing" in DPOD. (*Id*. at 98:11-16). Turner confirmed that GS-9 work in DPOD differs from GS-9 work in AWG because there is more of an analysis requirement in DPOD. (*Id*. at 95:3-5). She also testified that, while in DPOD, she did work normally done by GS-11 and GS-12 level employees including "processing classifications out of the classification queue" to assist with clearing a backlog. (*Id*. at 92:21-93:2). Jackson also testified that there was a higher volume of work in DPOD and that there is more detail to it, but he "wouldn't say it was harder." (Doc. 40-2 at 316:11-317:6). Penelope Cowart, however, agreed that AWG work is "easier" than DPOD work because "[t]here's not as many steps when you're processing paperwork," and that AWG work requires less analysis and is "more favorable" than DPOD work. (Doc. 40-3 at 22:19-23:7).

### B. DMS Personnel and Supervisory Roles

For the majority of Turner's time in AWG, Susan Renda ("Renda"), a white woman, was her supervisor. (Doc. 36-1 at 62:20-22, 69:9-11; Doc. 36-5 at 22:2-14; Doc. 36-8 at 17:4-20). Renda moved from the position of "manager" to a "lead" in January 2017, so she was no longer acting as Turner's direct supervisor.[2] (Doc. 36-1 at 117:21-118:3). Though Wayne Brewster

---

[2] There is a dispute as to when Renda stepped down as Turner's direct supervisor. Treasury's Motion for Summary Judgment states that Renda stepped down from management in 2016. (Doc. 37 at II.b.11.) However, Turner testified that she moved from supervisor to lead in January 2017 (doc. 36-1, 138:11-21), while Renda herself said she moved from lead in 2018 (doc.

("Brewster") was Turner's direct supervisor, Renda continued to direct her work as lead.  (Doc. 43 ¶ II.b.11.; Doc. 36-1, 13:11-21).  Renda retired in 2021.  (Doc. 36-8 at 12:4-5).  Brewster, a black man, served as the manager of the Contact Services Branch ("CSB"), which consisted of Correspondence, AWG, and DPOD, until Renda stepped down as the AWG supervisor.  (Doc. 36-1 at 138:13-19).  When Renda left her position as AWG supervisor, Brewster acted as Turner's direct supervisor.  (*Id*. at 138:13-21).  After the June 2018 reorganization, Brewster served as the manager over Correspondence and AWG, while Ivory Kangah ("Kangah"), a black woman, became the AWG supervisor from September 2017 through the Reorganization.  (Doc. 36-5 at 10:1-11:2; Doc. 36-7 at 7:2-3, 10:14-19; Doc. 36-1 at 69:16-8, 138:19-139:1; Doc. 36-18 at 3-4).  At the time Renda stepped down as AWG supervisor, Sharon Ward ("Ward"), a black woman, was serving as the director of the CSB.  (Doc. 36-1 at 139:2-6; Doc. 36-9 at 9:17-13:11).  When Renda stepped down, Ward became the acting manager of AWG until September 2017.  (*Id*.)  Ward retired in 2020.  (*Id*. at 10:1-5).  During Turner's employment in AWG and DPOD, Daniel Vavasour ("Vavasour"), a white man, was the Assistant Commissioner of DMS and oversaw operations in Birmingham, Alabama and Austin, Texas.  (Doc. 36-1 at 56:24-9; Doc. 36-12 at 9:14-23, 10:23-25).  There were six layers of supervision between Turner and Vavasour.  (Doc. 36-12 at 14:24-15:11).

---

36-8 at 17:4-6). For purposes of summary judgment, the undersigned accepts the timeline that Turner provided in her deposition.

### C. Timeline of Events

#### 1. Derrick Jackson's EEOC Complaint

Turner alleges she suffered discrimination and retaliation following her participation in the EEOC investigation of a complaint made by Jackson. Jackson was hired in March 2016 as a GS-9 employee in AWG. (Doc. 36-5 at 107:22-108:6; Doc. 40-2 at 12:24-13:2, 129:6-8). He filed a discrimination complaint with the EEOC that same year, and Turner was interviewed and submitted an affidavit as a witness in the investigation of his complaint. (Doc. 36-1 at 121:21-122:8). She testified that Renda showed favoritism to the white employees in AWG (specifically co-workers Josh Brown ("Brown") and Millicent Clark ("Clark"), GS-9 and GS-11 level employees, respectively). (Doc. 36-1 at 183:15-23). One of the ways Renda allegedly showed favoritism to white employees was by providing more projects to work on, which increased their likelihood of obtaining an "outstanding" performance appraisal. (*Id*.) An outstanding or exceeds expectations appraisal comes with an automatic financial reward, with the reward for an outstanding appraisal being highest. (Doc. 36-6 at 3). Turner testified that she and Jackson never received outstanding performance appraisals, and they were not given the opportunity to work on special projects until she complained to Brewster about the issue. (Doc. 36-1 at 183:23-184:1).

Brown also submitted a Declaration regarding Jackson's EEOC complaint. (Doc 36-13). In his statement, Brown said Renda, his immediate supervisor at the relevant time, made him feel uncomfortable by speaking about the personal information of his coworkers. (Doc. 36-13 at 1). Brown felt that he didn't "need to know" the information, and Renda's behavior toward him made him "look like a favorite." (*Id*.) Brown further testified in his statement that Renda treated Jackson poorly on several occasions. (*Id*. at 2-3). Brown indicated that Renda "played favorites" a great

deal, but he indicated that, in his opinion, Turner was one of the employees Renda liked and listened to.  (*Id.* at 3).  According to Brown, Jackson was not well-liked and frequently criticized by Renda.  (*Id.*)  In Brown's view, the criticism was not warranted.  (*Id.*)  Brown described AWG as "the most hostile work environment ever."  (*Id.* at 4).

Colette Tartt ("Tartt"), a black woman, was an AWG analyst during the Jackson EEOC investigation.  She declared in October 2016 that she heard Renda make statements Tartt considered to be racist on two separate occasions, but that they were not about fellow employees. (Doc. 36-14 at 3-4).  Turner confirmed that she never specifically heard Renda make racist comments, but that she had overheard a comment from Renda to Tartt about "black people and drugs," following which Tartt was upset and asked to speak to Renda in the conference room. (Doc. 36-1 at 204:2-206:5).  Turner testified to rumors from Tartt that Renda had said of working in AWG that she was "not used to being around so many black people."  (Doc. 36-1 at 206:15-207:18).  She also testified to hearing rumors that Renda's husband had urinated on the White House lawn when Barack Obama was President.  (Doc. 36-1 at 183:3-25).  Turner testified that Renda was more comfortable with Tartt and Virginia Miles ("Miles"), also a black woman, than she was with her.  (Doc. 36-1 at 67:18-22, 68:16-24).  She also testified that Renda and Miles worked closely with one another and that they "were mainly the issue as far as continuing to cause problems for everyone in that area."  (Doc. 36-1 at 117:16-20, 119:15-20).  Vavasour testified his

recollection that Renda was "of concern" and that, following the EEOC investigation she "was no longer involved in supervision."[3]  (Doc. 36-12 at 27:15-23).

After speaking with Brewster about the lack of opportunity to work on special projects, Turner had been receiving opportunities to volunteer for those in AWG. However, after she served as a witness in Jackson's EEO complaint, those opportunities stopped being extended.  (Doc. 36-1 at 80:2-16, 183:2-184:16).  Turner did not have "any problems" with Renda until after Jackson was hired.  (Doc. 36-1 at 67:23-68:2).  Shortly after she submitted an affidavit in Jackson's EEOC complaint, she spoke with Brewster about her new problems with Renda, and Brewster told her that "Renda was not going anywhere" and that he "needed to protect Suzanne."[4]  (Doc. 36-1 at 185:10-20).  Turner alleges that her participation in the investigation of Jackson's EEOC complaint along with race discrimination was the impetus for the negative employment actions she later suffered.

---

[3]    Treasury points out that Brewster, Jackson, and Renda herself testified that Renda stepped down from management of her own accord.  (Docs. 36-5 at 22:2-19; 40-2 at 150:2-6; 36-8 at 16:12-17:25).

[4]    Treasury objects to this statement indicating that Turner's testimony about what Brewster said is hearsay that cannot be rendered admissible at trial.  (Doc. 46 ¶ 2).  The court may consider hearsay if the evidence could be reduced to admissible evidence or an admissible form for trial purposes.  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) ("Nevertheless, 'a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form.'") (citing *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996) ("The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial.").  Brewster was noticed as a witness and deposed as part of the discovery process.  There is no reason Brewster could not be called to testify about whether he ever made any such statement.

### 2. Turner's 2016 Employment Appraisal

Turner alleges that her 2016 work appraisal was affected by racial bias from Renda and in retaliation for her participation in Jackson's EEOC investigation.  (Doc. 36-1 at 186:1-187:23).  Though Renda was no longer the AWG supervisor in 2017, she was responsible for 2016 employee performance appraisals.  (Doc. 36-1 at 62:20-24).  Employees' 2016 appraisals were made available to them in February of 2017.  (Doc. 36-1 at 186:2-4).  Turner received a "meets expectation" on her 2016 appraisal even though the wording of her appraisal was exactly the same as what was on her "exceeds expectations" appraisal in 2015.  (*Id*. at 62:22-63:18).  Turner also contends that her "numbers" were better in 2016 than in 2015.  (*Id*. at 63:2-5).  Performance appraisals are a factor in determining whether an employee receives a performance award.  (Doc. 36-6).  While awards are available for employees who receive a "meets expectations" appraisal, they are not automatic.  Instead, they "may be paid at the discretion of management with approval from an Assistant Commissioner/Executive Director, or equivalent."  (Doc. 36-6 at Section 3.A.4.).  Employees who receive an "exceeds expectations" appraisal automatically received an award equivalent to 1% of their salary, and employees who received an "outstanding" appraisal received an award equivalent to 1.5% of their salary.  (*Id*. at Section 3.A.1.).

Turner filed a grievance with the National Treasury Employees Union ("NTEU") regarding her 2016 "meets expectation" appraisal.  (Doc. 36-1 at 64:17-65:2).  After she filed the grievance, Ward and Brewster amended her performance appraisal to reflect "exceeds expectation."  (*Id*. at 65:3-7).  Turner testified that she was "satisfied" with the resolution but had expected an "outstanding" appraisal given her improved productivity since 2015, when she received her "exceeds expectations" appraisal.  (*Id*. at 63:2-5; 65:10-12).  When Turner filed the grievance

regarding her 2016 performance appraisal, she reported that she felt Renda was acting from racial bias.  (*Id*. at 197:1-9).  There was an investigation into the matter, but Turner was not told what investigators determined.  (*Id*.)

### 3.  The Meeting "Callout"

Turner alleges that she and Jackson were "called out" by Brewster and told not to sit together during a 2017 training meeting.  (Doc. 36-1 at 188:18-23).  As she and Jackson were walking into the training meeting together, Brewster said "here comes trouble" and directed them not to sit together.  (Doc. 36-1 at 188:18-23).  Ward ended up sitting between Turner and Jackson, and said she participated in the "callout" because Brewster had asked her to.  (Doc. 36-1 at 111:17-20).  Following this incident, Turner filed a complaint via letter with DMS Deputy Director Gail Blackmon Henderson ("Blackmon Henderson").[5]  (Doc. 36-1 at 111:21-25, 150:1-151:7).  Turner alleged in her letter to Blackmon Henderson that she approached Brewster about the incident and he responded that "he was just kidding around" and did not believe his actions to be inappropriate.  (Doc. 36-3 at 1).  In the letter to Blackmon Henderson, Turner indicated that she and Jackson were "being targeted, watched, and treated unfairly and I don't know why."  (Doc. 36-3 at 1).

She also filed a grievance with the NTEU.  (Doc. 36-1 at 112:22-113:12).  In the grievance, Turner noted that she had never had issues with Renda, Brewster or Ward prior to participating in

_____

[5] Turner asserts in her response to the motion for summary judgment that she forwarded an e-mail from Gail Blackmon to Vavasour in which Blackmon Henderson reprimanded Brewster and Ward for calling Turner and Jackson "troublemakers" in a meeting.  (Doc. 43 ¶ 10, citing Doc. 40-8, May 9, 2018).  Treasury denies this statement, noting that the citation did not support the alleged facts.  (Doc. 46 ¶ 10).  Indeed, document 40-8 includes e-mails between Turner and Vavasour on May 9, 2018, but does not include the referenced letter.  As such, the undersigned will not consider the alleged fact.

the investigation of Jackson's 2016 EEOC complaint.  (*Id*. at 184:23-185:1).  Brewster, however, indicated that he had a good working relationship and was "friends" with Turner.  (Doc. 36-5 at 49:8-50:1).  He acknowledged that their relationship changed at some point but did not know "when" things changed.  (*Id*. at 50:2-8).  Brewster testified during his deposition that he did not recall the 2017 meeting.  (*Id*. at 45:12-46:3).  He also did not recall apologizing to Turner or her sending a grievance letter to Blackmon Henderson.  (*Id*. at 46:4-16).  However, during his 2018 EEO interview, Brewster noted that he did apologize to Turner following the training-session incident and said that "he would not kid/joke" with her and Jackson moving forward.  (Doc. 40-10 at 3).

When asked about Turner's assertion that she was being retaliated against by Brewster and Ward, Vavasour did not recall conducting an investigation into her allegation.  (Doc. 36-12 at 50:20-24).  Vavasour was presented with an e-mail during his deposition that he indicated appeared to be "confirming that Gail Blackmon, who was [Renda's] boss at the time, reprimanded both [Ward] and [Brewster] for what took place . . . ."  (*Id*. at 70:6-14).  Vavasour testified that, to his knowledge, Turner was "a steady employee" and that the term "troublemaker" would not "describe the [Turner] I know."  (*Id*. at 29:5-10).  He also noted that, though he was not personally aware of the meeting, to label Turner and Jackson troublemakers "would be inappropriate."  (*Id*. at 29:11-19).

### 4.  The Reorganization

#### a.  Decision-making Process

The work environment in AWG was brought to the attention of Assistant Commissioner Vavasour prior to the Reorganization.  Before the Reorganization was approved, the NTEU

approached Vavasour and described AWG as "really struggling." (Doc. 36-12 at 36:3-10).

According to Brewster, there were multiple conflicts in the AWG and numerous employees had

filed complaints with Labor Relations about coworkers. (Doc. 36-5 at 26:18-27:4). Brewster, who

was the manager of the AWG, DPOD, and Correspondence departments in DMS-East from 2015

through 2018, (doc. 36-5 at 10:9-11:1) suggested to Vavasour and Ward that a restructuring of

those departments was needed. (*Id*. at 58:5-16). He confirmed in his deposition that it was his

idea to restructure the branch. (*Id*. at 34:14-16). As part of the proposed reorganization, Brewster

created several possible organizational charts for staff restructuring. (Doc. 36-5 at 104:16-

105:110; 115:21-116:6). According to Brewster, Turner may have been placed in different

departments depending on which proposed organizational chart ended up being used. (*Id*. at

115:21-116:9). Renda testified that she did not have any input regarding the reorganization

process. (Doc. 36-8 at 50:13-16, 51:19-52:16).

Any time an employee is moved to a different assignment, either individually or via a

departmental reorganization, the move must go through the Treasury's human capital division.

(Doc. 36-9 at 14:2-16:10). On May 23, 2017, Ward prepared a memorandum to Randy Thornton

("Thornton"), a Human Capital Officer with the Bureau of the Fiscal Service. (Doc. 36-11). The

memorandum requested approval for the reorganization of the branches of DMS-East, noting that

the organizational structure of DMS-East conflicted with "operational procedures" and created

"avoidable operational challenges." (*Id*.) The memorandum also noted that the DMS-East, as it

was structured at the time, had "staff distribution inequalities which [had] contributed to employee

environment issues, work reduction, and a span of control complications." (*Id*.) The formal DMS-

East reorganization proposal was submitted to Treasury Human Capital in March 2018. (Doc. 36-

16).  The proposal indicated that the reorganization would affect the Contact Services Branch of DMS-East, comprised of "management and program analyst[s], administrative wage garnishment specialists (AWG) and correspondence assistance" and outlines the functional reasons for the Reorganization.  (*Id*. at 1).  The proposal indicated that two managers and 37 employees in the "Bargaining Unit" in Birmingham, Alabama would be affected.  (*Id*. at 3).  The Reorganization was ultimately approved and employees, including Turner, were reassigned in June 2018.  (Doc. 36-1 at 114:7-20).

Vavasour testified that the purpose of the Reorganization was to "[i]mprove control, load balancing, and aligning grade appropriate work with the graded employees." (Doc. 36-12 at 16:3-8).  Prior to the Reorganization, there were concerns about employees performing work that was above their grade-level.  (*Id*. at 18:4-12).  According to Vavasour some employees, specifically Jackson, were frustrated that they were being asked to perform GS-11 level work as a GS-9 without additional compensation.  (*Id*. at 18:8-18).  He noted that, after the Reorganization, there were plenty of people in place for employees to do appropriate grade-level work.  (*Id*. at 18:19-24). Vavasour testified that, at the time of the Reorganization, the department had "backlogs and excessive overtime that we were trying to address and there were opportunities to realign to improve both the output for the customers and reduce the cost for the organization." (*Id*. at 8-12). Though he did not recall, Vavasour said he would not be surprised if one of the stated reasons for the Reorganization was to facilitate "a better working environment."  (*Id*. at 16:17-21).  He further testified that, although discord within AWG was "not the direct reason" for the reorganization, "there was definitely discord within the area" and "we wanted a better working environment."  (*Id*.

at 16:13-21).  Brewster testified that Vavasour told him that the employees "needed new beginnings to move forward with their careers."  (Doc. 40-9 ¶ 13).

Turner was not involved in the decision-making process for the Reorganization, but she confirmed her understanding that Vavasour was the final decision-maker based on an email from him.  (*Id*. at 109:10-24).  She testified Vavasour considered Ward and Brewster's input on the reorganization decision, and she is unaware of anyone else's input being considered.  (*Id*. at 109:25-110:3).  Vavasour testified that he "supported the realignment package that was prepared by Wayne Brewster and ultimately signed off by [Ward]" and "did not have reservations" about the plan.  (Doc. 36-12 at 22:23-23:5).  The Reorganization at issue is not the only one that the Treasury has undergone in the last several years.  (Doc. 36-1 at 107:4-23).  Turner stated that the Treasury may have been undergoing a reorganization at the time of her February 2, 2024, deposition.  (*Id*. at 107:12-13).

### b.  Union Approval of the Reorganization

Brewster also consulted with the NTEU regarding the Reorganization before submitting the final proposal to Vavasour.  (*Id*. at 104:23-105:10).  He consulted with Mike Sweet ("Sweet"), a white man, who was the vice-president of the NTEU at the time.  (*Id*. at 105:1-6).  Brewster testified that Billy Adams ("Adams"), a black man and the president of the NTEU at the relevant time, chose the final reorganization structure.  (*Id*. at 105:4-13).  However, Jackson testified that Adams was on extended leave while the Reorganization was being decided and, instead of Adams, Sweet was making decisions for the NTEU at that time.  (Doc. 40-2 at 213:14-215:25).

As part of the final approved reorganization structure, Sharon Terriel ("Terriel"), a black woman and GS-13 level employee, was slated to become the incoming supervisor of AWG.  (Doc.

36-5 at 69:13-15).    When Terriel received a copy of the approved reorganization plan from

Brewster with individual employees listed in their new departments, she responded to Brewster

via e-mail that "[Turner] and [Jackson] are still in the same section" and that "keeping them in the

same section would not help the situation." [6]    (*Id*. at 69:16-70:8; Doc. 40-6).    Brewster raised

Terriel's concerns to Ward, who noted "at some point we just have to make a management decision

and move on."    (*Id*. at 75:11-17).    The e-mail thread also discussed Kangah's placement so she

was not placed in a department with an employee who previously filed an EEOC complaint against

her.    (Doc. 36-12 at 83:3-84:6; Doc. 36-10).    Ward noted that Kangah had "requested not [to]

supervise any previous staff.  [Turner] and Adrianne possible change would satisfy both requests."

(Doc. 40-6.)    Vavasour ultimately approved the reorganization package that was prepared by

Brewster and approved by Ward.[7]    (Doc. 36-12 at 23:1-5; Doc. 36-16; Doc. 36-18).

### c.  Turner's Concerns Regarding the Reorganization

---

[6]  Treasury objects to Doc. 40-6 as incomplete under rule 106 of the Federal Rules of
Evidence.  (Doc. 46 ¶ 5).  Rule 106 states that "[i]f a party introduces all or part of a statement, an
adverse party may require the introduction, at that time, of any other part—or any other
statement—that in fairness ought to be considered at the same time.  The adverse party may do so
over a hearsay objection."  Under the rule, Treasury could have moved that the court require
production of the entire e-mail thread or produced the entire thread themselves for comparison.
However, they did not do so.  The rule does not, however, prohibit the court from considering the
partial statement if the adverse party does not require introduction of the complete statement.  As
such, to the extent Treasury objects to the court's consideration of Doc. 40-6, the objection is
overruled.
      [7]  Turner asserts that Vavasour responded to the email and further discussed Kangah's
placement.  (Doc. 43 ¶ 6).  Treasury objected to the statement, noting that "[t]he alleged fact is not
supported by the citation.  (Doc. 46 at ¶ 6).  Treasury's assertion is correct.  The quote and
Vavasour's response is not included in the portion of the e-mail thread cited by Turner. (*See* Doc.
40-6). As such, it will not be considered.

Turner and Jackson were the AWG Specialist GS-9 employees in AWG at the time of the Reorganization. (Doc. 36-18 at 2; Doc. 36-1 at 58:6-24). As part of the Reorganization, both were moved from AWG to DPOD. (Doc. 36-1 at 58:19-59:11). Turner retained her GS-9 level. (Doc 36-1 at 47:18-24). She asserts that her transfer was involuntary and that being transferred out of AWG was due to racial discrimination and/or retaliation for engaging in protected EEOC activity. As discussed above, both Turner and Jackson had engaged in protected activity prior to being transferred from AWG to DPOD.[8] (Doc. 36-5 at 65:2-23). Terry Bullard ("Bullard"), a white man, was also a GS-9 level employee in AWG at the time of the Reorganization, but he was a Digital Scanning Technician, not an AWG Specialist.[9] (Doc. 36-18 at 2; Doc. 36-17 ¶ 6). As part of the Reorganization, Bullard was moved to Correspondence. (Doc. 36-18 at 4; Doc. 36-17 ¶ 6).

---

[8] Jackson filed an EEOC complaint regarding alleged race discrimination by Renda, and Turner provided testimony in support of his claim. "Under the Opposition Clause of Title VII's anti-retaliation provision, an employee is protected from discrimination if she 'has opposed any practice made an unlawful employment practice by this subchapter.'" *Anduze v. Fla. Atl. Univ.*, 151 App'x 875, 878 (11th Cir. 2005)(citing 42 U.S.C. § 2000e-3(a)). To show protected activity under the Opposition Clause, a plaintiff must demonstrate "that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). It is clear that filing an EEOC complaint based on alleged race discrimination and participating in the investigation of the same would constitute protected activity, and Treasury does not argue otherwise.

[9] This information is found within the declaration of Sarah B. Ferree, a Human Resources Specialist in the Workforce Policy and Programs Branch of the Human Capital Division of the Office of Workforce and Administrative Services. (Doc. 36-17). Turner moved to strike Ferree's declaration, arguing that Ferree was not initially disclosed as a potential witness. (Doc. 42). Treasury responded to the motion (doc. 45) and moved for leave to substitute Ferree's declaration for a declaration from Amanda Jackson (doc. 44). Amanda Jackson was disclosed by Treasury as a Human Resources Officer in Treasury's initial disclosures on March 31, 2021. (Doc. 44 ¶ 5). Amanda Jackson was not deposed. In her response to Treasury's motion to substitute the declarations, Turner argues, whether the statement is from Ferree or Amanda Jackson, it should

Turner was informed in the spring of 2018 that she was being transferred.  (Doc. 36-1 at 116:15-19).  Initially, she was slated to be transferred to correspondence, but after informing Brewster of a health condition, she was moved to DPOD instead.  (*Id.* at 58:19-59:11, 177:11-178:18).  On April 30, 2018, Turner e-mailed Vavasour regarding her conversation with Brewster.

––––––––––––––––––––

not be considered because both statements discuss Bullard's transfer from AWG to DPOD.  (Doc. 49).

Turner argues that information regarding Bullard's transfer is a "post-discovery attempt to reveal new evidence" because it contradicts Treasury's original response to Turner's request for admission.  Initially, Treasury admitted that "only black employees were removed from AWG." (*Id.* at 3; Doc. 40-4 ¶ 10).  Treasury acknowledges the erroneous admission and notes that Bullard was likely overlooked due to his holding a different position than Turner and Jackson, despite also being a GS-9 level employee.  Treasury discovered the error while preparing its Motion for Summary Judgment and provided an amended response to the request for admissions within 30 days of the discovery.  (Doc. 45 at 4; Doc. 45-2).  Turner does not dispute that the amended response was provided.

Despite Treasury's erroneous initial response to the request for admission, Turner was provided with information about Bullard and, as such, the information contained in the Ferree and Amanda Jackson statements were not a "surprise" to Turner.  (Doc. 50 at 4).  Treasury provided Turner with an organizational chart showing the reassignment of individuals as part of the Reorganization.  (Doc. 45-3 at 3-4).  The chart shows Bullard was a GS-9 level Digital Scanning Technician who was moved from AWG (FD0453000103010000) to Correspondence (FD0453000103030000).  (Doc. 45-3 at 3-4).  Further, Treasury points to a chart titled "Employees Impacted by Reorganization" that was produced in discovery.  (Doc. 45-6).  The chart lists impacted employees along with their dates of birth, race, sex, and whether they were involved in prior EEO Activity.  (*Id.*)  Turner also does not dispute that this document was produced in discovery.  Therefore, she could have cross-referenced these documents and discovered the error in Treasury's response to the request for admission.

As Treasury notes, Ferree's declaration is a distillation of the information contained in documents produced as part of discovery.  Per Rule 1006 of the Federal Rules of Evidence, "[t]he court may admit as evidence a summary, chart, calculation offered to prove the content of voluminous admissible writings, recordings or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence."  In service of continuity and because, upon inspection, the declarations of Ferree and Amanda Jackson are substantively identical, Treasury's motion to substitute Ferree's declaration with Amanda Jackson's (doc. 44) is **GRANTED**.  Turner's motion to strike Ferree's declaration (doc. 42) is **MOOT**, and, to the extent the motion to strike extends to Amanda Jackson's declaration, the motion is **DENIED**.

(Doc. 40-7).  She noted that she would be meeting with Ward the following week.  (*Id*.)  When asked why she thought the reorganization occurred, Turner said, "we were moved because of all of the cases that we filed.  I think we were moved because of the 2016 case.  That was that discrimination case that Derrick [Jackson] had filed.  I think we were moved because of the grievance that I had provided to Wayne and pertaining to my performance appraisal that was changed and then changed again.  I think we were moved because we were humiliated and embarrassed at a training class that we went to."  (Doc. 36-1 at 110:23-111:9).

During a meeting with Kangah, Kangah told Turner that she and Jackson were being transferred out of AWG as punishment.[10]  (Doc. 36-1 at 190:19-25).  Turner testified that she did not know what she would have been punished for "other than [participating] in the discrimination case for Derrick" or "the grievances [she] had put in."  (*Id*. at 191:1-7).  Turner does not know when DMS began working on the plan for the Reorganization or why it occurred.  (*Id*. at 113:21-114:4).  However, she believes her specific transfer was "racially motivated because of [Renda], because of the way that she was treating me, the way that she downgraded my evaluation from the exceeds to meets.  You know, Derrick Jackson, with me participating in his discrimination case against her, I felt that it was because of that – because of [Renda] and them not moving her."  (*Id*. at 135:1-9).  In late 2017, Turner submitted a grievance to the NTEU via Adams.  (Doc. 36-1 at 113:4-12, 116:9-14).  Adams responded to the grievance via e-mail noting "the AWG group as it

---

[10] Kangah disputes this assertion and states in her deposition that she does not recall having any conversation at all with Turner or Jackson about why they were being moved out of AWG. (Doc. 36-7 at 11:15-12:23).  For summary judgment purposes, this dispute is resolved in Turner's favor.

stands was creating its own problems consistently," and that the Reorganization "may not make everyone happy but it does give everyone an opportunity for a fresh start . . . ." (*Id*.at 116:15-117:13).

When asked why Turner could not have remained in AWG if that was her preference, Vavasour testified that all GS-9 employees were being moved out of AWG because one of the primary purposes of the reorganization was to ensure that employees were doing grade-appropriate work. (Doc. 36-12 at 80:20-83:2). He further explained his understanding that employees' reassignments in the Reorganization involved a "preference process." (Doc. 36-12 at 23:11-24:5). Vavasour states that a group meeting was held with AWG, and he and Brewster attended the meeting. (*Id*.) At the meeting, employees had the opportunity to give their first and second preference regarding new placements. (*Id*. at 23:13-25). If any employees were excluded from that meeting or not allowed to give preferences, Vavasour testified that it would be "a deviation from the process that was advanced." (*Id*.) Turner and Jackson testified that they did not receive preference sheets.[11] (Docs. 40-1 ¶ 3; 40-2 at 132:5-12).

In an email, Vavasour told Turner that DPOD was backlogged and "we could really use your help in that space." (Doc. 36-1 at 59:12-19). Turner acknowledged that DPOD was "usually" backlogged. (*Id*. at 60:19-24). Though she preferred being reassigned to DPOD versus Correspondence, Turner viewed any transfer out of AWG as undesirable. (*Id*. at 178:3-18). One

---

[11] Turner asserts that, in a May 10, 2018, e-mail Ward told Vavasour that she had changed Turner's placement and that Kangah could not supervise another employee. (Doc. 43 ¶ 11, citing Doc. 40-8). Treasury denied this statement as well. Because the referenced e-mail is not included in the summary judgment documents, this alleged fact also will not be considered.

21

reason she found the transfer to DOPD undesirable is because she heard a rumor that Ward said, "no growth and no 11s, no other 11 or 12s in DPOD." (Doc. 36-1 at 103:20-22). Turner did not receive that information directly from Ward but, instead, from a coworker named Paul who may or may not have heard it directly from Ward. (*Id*. at 104:1-18). Turner did note, however, that she believes Marilyn Jacobs, a black employee, was promoted from either a GS-7 or GS-9 to a GS-11 in DPOD before Turner was transferred to DPOD. (*Id*. at 102:3-103:12).

### d. Personnel Outcomes of the Reorganization

In 2018, thirty-nine employees worked in the Contact Services Branch. (Doc. 52-1 ¶ 4; Doc. 36-5 at 12:17-23). Of the thirty-nine employees, twenty-three self-identified as black, eight self-identified as white, two self-identified as Hispanic, and six self-identified as biracial or did not disclose their race information to the Fiscal Service.[12] (Doc. 52-2 ¶¶ 5-43). Of those thirty-nine employees, twenty-six were moved to different departments. (*Id*.) Seventeen of the employees were black, six were white, one was Hispanic, and two did not report their racial self-identification. (*Id*.) Thirteen employees remained in their original departments, four of them remaining in AWG. (*Id*.) Of the employees who stayed in their original departments, six were black, two were white, one was Hispanic, and four identified as biracial or did not report racial information. (*Id*.) Of the employees who stayed in AWG, one was black, two were white, and

_____

[12] Given that Ferree's statement notes employees who have "not reported" their race to the Fiscal Service, it appears that all racial information cited in the statement is based on self-reporting by employees about their own racial identity. Additionally, Ferree's statement refers to employees identifying as black as "African American," and employees identifying as White as "Caucasian." (*See* Doc. 36-17). This memorandum opinion uses "black" and "white," as these are the descriptors used by the parties in the briefing.

one was Hispanic. (*Id.*) All of the employees who stayed in AWG or were transferred into AWG were GS-11 level employees or higher. (*Id.*) According to Vavasour, the "vast majority" of DMS employees "were impacted in one way or another" by the Reorganization. (Doc. 36-12 at 17:22-18:3). At the time of the Reorganization, there were ten employees in AWG, the majority of whom were black. (Doc. 36-18 at 2; Doc. 36-5 at 61:21-62:1; Doc. 36-1 at 137:6-9). Three of the ten AWG employees at the time of the Reorganization were white. (Doc. 52-2 ¶¶ 5, 41, 42).

The Reorganization also changed the leadership structure of AWG and DMS as a whole. Prior to the Reorganization, Brewster was the manager of AWG, DPOD and Correspondence. (Doc. 36-5 at 10:18-11:2). After the Reorganization, he managed only AWG and Correspondence, and Gale Fortner ("Fortner") became the manager of DPOD. (*Id.* at 11:7-13:12). The split gave both Brewster and Fortner approximately 20 employees under their supervision, lessening Brewster's managerial load. (*Id.* at 11:15-13:3; Doc. 36-7 at 7:18-8:6, 9:20-10:7).

Miles, GS-12; Kangah, GS-13; and Verlinda Harper ("Harper"), GS-12, all black women, were also transferred out of AWG as part of the reorganization. (Doc. 36-5 at 63:15-65:1). Miles later transferred back to AWG as a GS-13 supervisor. (Doc. 36-1 at 143:14-20; Doc. 36-7 at 16:1-20). Harper and Miles had not engaged in any EEOC activity prior to January 1, 2019, while Kangah, Jackson and Turner had all filed formal EEO complaints.[13] (*Id.* ¶¶ 5, 7-9). Jackson testified in his deposition that Harper "had problems" with Renda because Harper also did not get her bonus for her 2016 performance appraisal. (Doc. 40-2 at 189:8-9).

_____

[13] Turner alleges in her response to the Motion to dismiss that Miles did have EEO activity. (Doc. 43 ¶ 67). However, Turner cites her own deposition as evidence of the same, and the sections cited do not discuss Miles at all. (*See Id.* citing doc. 36-1 at 63:19-65:1).

There were also employees who transferred into AWG or remained in AWG as part of the June 2018 reorganization.  Brewster testified in his EEO Investigative Affidavit that "[t]he only [AWG] specialists that remained in the [AWG] section post reorganization were GS-11s, the GS-13 lead, and the supervisor."  (Doc. 40-9 ¶ 16.1).  Sharon Terriel (GS-13); Angela Parker (GS-11); Melissa Roan (GS-11); and John Cruz ("Cruz") (GS-12) – two black women, a white woman, and a Hispanic man, respectively – were transferred into AWG.  (Doc. 36-1 at 154:1-13, 155:14-16; Doc. 36-5 at 66:12-13; Doc. 36-7 at 17:9-21:6; Doc. 52-2 ¶¶ 7, 21, 23, 27).  Of the four, only Cruz had EEO activity prior to January 1, 2019.  (Doc. 36-15 ¶¶ 5-6).  He had filed a formal EEO complaint in 2016.  (*Id.* ¶ 6).  The following employees remained in AWG: Darlene Craig (GS-11); Suzanne Renda (GS-13); Millicent Clark (GS-11); and Ernesto Velez (GS-11) – a black woman, two white women, and a Hispanic man, respectively.  (Doc. 36-1 at 154:14-24; Doc. 36-8 at 50:17-19, 55:7-10l; Doc. 36-7 at 17:17-21:6; Doc. 52-2 ¶¶ 40-43).  The employees who remained in AWG had also participated in Jackson's EEOC investigation.  (Doc. 36-4).  Only employees who were GS-11s or higher were moved into or remained in AWG.  (Doc. 36-1 at 200:15-17).  Presently, however, there are GS-5 employees working in AWG.  (Doc. 36-7 at 15:16-16:7; Doc. 40-4 ¶ 16).  The GS-5 employees are "non-analyst assistants" and began working in AWG after the Reorganization.  (Doc. 40-4 ¶ 16).  Turner testified that, during the Reorganization, Miles was given an opportunity to receive a higher grade.[14]  (Doc. 36-1 at 192:4-17).

---

[14] Treasury alleges that the reorganization did not change employees' grade levels and that no transferred employees were promoted.  (Doc. 43 ¶¶ 73-74).  Because there is a disagreement regarding this fact, it is construed in favor of the non-moving plaintiff.

### III. Analysis

In her complaint, Turner alleges she suffered both race discrimination and retaliation in the course of her employment.  Because Turner was, at the relevant time, a federal employee, the appropriate standard for evaluation of her claims was set by the Supreme Court of the United States in *Babb v. Wilkie*, 589 U.S. 399 (2020) ("*Babb I*") and applied by the Eleventh Circuit on remand in *Babb v. Secretary, Department of Veterans Affairs*, 992 F.3d 1193 (2021) ("*Babb II*").  In its decision, the Supreme Court provided a detailed analysis of the plain language of the federal-sector provision of the ADEA, which reads in relevant part: "All personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age."  29 U.S.C. § 633a(a).

On remand, in addition to addressing the plaintiff's ADEA claim, the Eleventh Circuit determined that the Supreme Court's holding required that they also address "whether the Court's decision undermined to the point of abrogation *Trask*'s Title VII holding, on which we earlier relied." 992 F.3d 1193 at 1198.  Because the federal-sector provisions of both the ADEA and Title VII "are materially identical," the Eleventh Circuit concluded "the Supreme Court's analysis of the former controls the latter as well." *Id*.  The relevant portion of Title VII's federal-sector provision reads: "All personnel actions affecting employees . . . in executive agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).  The Eleventh Circuit further determined that Babb's retaliation claim must be considered under the "made free from any discrimination" standard, as "[t]his court long ago construed § 2000e-16(a)'s prohibition of 'any discrimination' to directly 'bar[] reprisals against

federal employees who file charges of discrimination.'" *Id*. at 1203, citing *Porter v. Adams*, 639 F.2d 271, 277-78 (5th Cir. Unit A Mar. 1981).[15]

To succeed at summary judgment, Treasury must show there is no material issue of fact that personnel actions taken toward Turner were made "free from" any discrimination based on race or as reprisal for participating in protected EEOC activity by testifying in the investigation of Jackson's race discrimination EEOC grievance. Viewing the facts in the light most favorable to the non-moving party, Turner, the undersigned finds that Treasury's Motion for Summary Judgment is due to be granted with regard to Turner's claim of race discrimination but denied as to part of her retaliation claim.

### A. Count I – Race Discrimination

A Title VII plaintiff asserting a disparate treatment claim must show the defendant acted with discriminatory intent. *Denny v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001). "In order to show discriminatory intent, a plaintiff must demonstrate that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects on an identifiable group." *Joe's Stone Crab, Inc.*, 220 F.3d at 1273 (internal quotation marks, alterations, and citation omitted). An employee can prove intentional discrimination using direct, circumstantial, or statistical evidence. *Alvarez v. Royal Atl. Devs.*, 610 F.3d 1253, 1264 (11th Cir. 2010).

---

[15] The decisions of the former Fifth Circuit handed down before October 1, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

The Eleventh Circuit has held that a federal-sector employee asserting an intentional discrimination claim must still generally establish a *prima facie* case of discrimination.[16]  *See Buckley v. Sec'y of Army*, 97 F.4th 784, 796 (11th Cir. 2024).  To make out a *prima facie* case, an employee must show "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably."  *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (citation omitted). To demonstrate the fourth element of the disparate treatment *prima facie* case, a plaintiff must ordinarily point to comparators who are "similarly situated in all material respects."  *Lewis*, 918 F.3d at 1226.[17]  In *Lewis*, the Eleventh Circuit provided a non-exhaustive list of the types of similarities that would "underlie a valid comparison": whether the comparator (1) "engaged in the same basic conduct (or misconduct) as the plaintiff"; (2) was "subject to the same employment policy, guideline, or rule as the plaintiff"; (3) was "ordinarily (although not invariably) . . . under the jurisdiction of the same supervisor as the plaintiff"; and (4) "share[d] the plaintiff's employment or disciplinary history."  *Id.* at 1227–28.

Absent a *prima facie* case of discrimination, a plaintiff can point to "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  *Jenkins v.*

---

[16] Given the *Babb* cases, the Eleventh Circuit has also recently assumed without deciding that establishing a *prima facie* case is sufficient for a plaintiff to survive summary judgment. *Rosado v. Sec'y, Dep't of the Navy*, 127 F.4th 858, 866 (11th Cir. Feb. 4, 2025).  Treasury has not suggested that anything more is required of Turner in this case.

[17] The Eleventh Circuit held that a federal-sector plaintiff's *prima facie* case "must include 'meaningful comparator analysis'" consistent with *Lewis*.  *Rosado*, 127 F.4th at 866 (quoting *Lewis*, 918 F.3d at 1224).

*Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (citation and quotation marks omitted).  A plaintiff may

show a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional

discrimination by the decisionmaker" by relying on evidence showing, "among other things, (1)

suspicious timing, ambiguous statements, or other information from which discriminatory intent

may be inferred, (2) systematically better treatment of similarly situated employees, and (3)

pretext." *Id.* (cleaned up).

Turner alleges that her reassignment from AWG to DPOD during the Reorganization was

an adverse employment action that she suffered because of Renda's racial animus.[18]  (Doc. 1 ¶¶

96-115).  She alleges that the Reorganization "began in order to move Turner and Jackson out of

the department with Suzanne Renda" and that, even though Renda had been investigated for

allegations of race discrimination she "remained in AWG when she was the employee who should

---

[18] Turner does not allege in the Complaint that either her 2016 performance appraisal or the "meeting callout" were actions taken because of racial animus.  (*See* Doc. 1).  Treasury does, however, address the idea that Turner's 2016 performance appraisal was tainted by Renda's racial bias in the motion for summary judgment.  (Doc. 37 at 23).  To the extent Turner intended to argue that either the appraisal or "meeting callout" were motivated by racial bias, she does not address them in her response to the motion for summary judgment.  (Doc. 41).  Thus, she has abandoned those claims. *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *Bush v. J.P. Morgan Chase Bank, N.A.*, No. 2:15-cv-00769-JEO, 2016 WL 324993, at *6 (N.D. Ala. Jan. 27, 2016); *Boyd v. Daniels*, No. 2:13-cv-354-MEF, 2014 WL 1245885, at *3 (M.D. Ala. Mar. 24, 2014) (dismissing claims on motion to dismiss for failure to respond); *Joseph ex rel. Joseph v. Allen*, No. CV-13-S-695-NE, 2013 WL 3712334, at *5 (N.D. Ala. July 12, 2013) (dismissing claim on motion to dismiss for failure to respond); *Hooper v. City of Montgomery*, 482 F.Supp.2d 1330, 1334 (M.D. Ala. 2007) (same) (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (dismissing undefended claims on summary judgment)); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.")

have been moved due to her misconduct." (*Id*. at ¶¶ 105, 110). Turner indicated in her deposition that she felt she was moved "because of all the cases that we filed. I think that we were moved because of the 2016 case. That was that discrimination case that Derrick had filed." (Doc. 36-1 at 110:23-111:15). However, that reasoning relates to her retaliation claim rather than race discrimination.

Turner further argues that "a reasonable jury could conclude . . . that race played a part in the decision to retain Renda in AWG and move . . . Turner . . . in the reorganization." (Doc. 41 at 33). Turner alleges she has presented a genuine issue of material fact because:

> Viewed in the light most favorable to Turner, the evidence shows that Renda, who was a white supervisor, was kept in AWG in the reorganization after Jackson's EEO complaint against her, for which Turner testified in support. However, Turner and Jackson, who are black and who participated in support of the complaint, were moved out. Thus, a white former supervisor, who had an EEO complaint against her, was allowed to stay in the department, while the black employees who filed and supported the claim against her were moved in the interests of "giving employees a new beginning" and a better working environment. Additionally, Defendant admitted that all of the employees who were moved out of AWG were black but has now claimed (through a declaration of an undisclosed witness) that a white employee was moved on or around August 2018, after Turner raised her concerns about the move in April 2018. This inconsistency shows that genuine issues of material fact exist surrounding the reorganization.

(Doc. 41 at 31-32) (internal citations omitted).

The mere fact that Renda remained in AWG while Turner was transferred is not sufficient to create a question of fact regarding race discrimination. Turner does not set forth facts that any other Treasury employee involved in facilitating the Reorganization (Brewster, Ward, and Vavasour) acted out of racial animus. She also does not allege that the NTEU president and vice

president (Adams and Sweet) acted out of racial animus.  Finally, the only Treasury employee who Turner makes any claims of race discrimination against, Renda, testified that she had no input in the reorganization process (doc. 36-8 at 50:13-16, 51:19-52:16), and Turner has not disputed that claim.

Further, Turner does not provide a comparator to support her allegation that she was treated differently during the Reorganization than any other similarly situation employee.[19]  She alleges that only black employees were transferred out of AWG.  However, this is (1) incorrect and (2) not sufficient to create comparators because the AWG employees were predominately black and because black employees were also moved *into* AWG.[20]  (Doc. 52-2 at ¶¶ 5, 7, 14, 21, 27, 28).  In response to the lack of comparators, Turner points out that the existence of a comparator is not an immediate death knell for a claim.  It is true that "failure to produce a comparator does not necessarily doom the plaintiff's case" so long as the plaintiff can show "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent . . . ."  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  But the purpose of producing a comparator is to raise an inference of discrimination.  *Lewis*, 918 F.3d at 1225 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981).  Turner has not pointed to anything

---

[19] Turner attempts to use Renda as a comparator.  However, Renda is not sufficiently similarly situated to be used as a comparator for several reasons.  First, Renda held a very different position that Turner.  Renda was a supervisor, and Turner has never been employed as a supervisor.  (Doc. 36-1 at 134:12-18).  As such, Renda was not "similarly situated" to Turner.

[20] Turner's assertion that Treasury initially stated that only black employees were transferred out of AWG but later noted that a white employee was also transferred out does not create an issue of fact for the reasons set out in the resolution of the evidentiary motions.  *See supra*, n.9.

else that would serve to raise a genuine issue of material fact as to whether her transfer during the Reorganization was attributable to racial discrimination, such as through the convincing mosaic framework.  Therefore, comparator or not, her race discrimination claim may not proceed.

Per the *Babb* cases, Turner must show that racial discrimination was the "but-for" cause of disparate treatment, but not the but-for cause of the ultimate outcome.  As such, she need not show that the Reorganization would not have happened without racial discrimination, but only that discrimination based on race played a part in the decision to transfer her from AWG to Correspondence or DPOD.  Turner has not done so.  She fails to assert any specific instance of racial animus to support her claims that personnel decisions were not made free from any discrimination based on race.  Turner has failed to show even disparate treatment when it comes to her transfer from AWG to DPOD.  For those reasons, Treasury's motion for summary judgment is due to be granted as to Turner's race discrimination claim.

### B. Count II – Retaliation[21]

"Under the Opposition Clause of Title VII's anti-retaliation provision, an employee is protected from discrimination if she 'has opposed any practice made an unlawful employment

---

[21] Turner filed a motion to strike the Declaration of Lori Watt (doc. 36-15), the Equal Employment Opportunity (EEO) Resolution Program Manager for the Bureau of Fiscal Service. (Doc. 42).  In her motion, Turner asserts that Watt's declaration is improper because Watt was not disclosed as a potential witness or person with discoverable information during the discovery process.  (Doc. 42 at 2-3).  She further argues that Watt's declaration is deficient because she does not state that she was employed in her position as EEO Resolution Program Manager at the time of the EEO complaints she discusses in her declaration and because her statements are overly vague.  (*Id*. at 3-6).  Treasury rebuts that because Watt's declaration simply condenses information previously disclosed in discovery and, therefore she was not required to be disclosed in discovery.  Treasury further argues that that even if Watt should have been disclosed, failure to do so was

practice by this subchapter.'" *Anduze v. Fla. Atl. Univ.*, 151 F. App'x 875, 878 (11th Cir. 2005) (citing 42 U.S.C. § 2000e–3(a)).  Turner "must show that (1) she engaged in protected activity (by, for example, initiating an EEOC complaint); (2) she suffered an adverse action; and (3) a causal link exists between the protected activity and the adverse action." *Varnedoe v. Postmaster Gen.*, No. 21-11186, 2022 WL 35614, at *2 (11th Cir. Jan. 4, 2022) (citing *Taylor v. Runyon*, 175 F.3d 861, 868 (11th Cir. 1999)).  To show protected activity under the Opposition Clause, a plaintiff must demonstrate "that [s]he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices."  *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997).  This contains both a subjective and an objective component:

> A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Id.*

---

justifiable and harmless.  (Doc. 45 at 7-9).  Much like the declarations of Ferree and Amanda Jackson, the information Watt covers in her declaration – which employees did not have EEO activity with the Fiscal Service prior to January 1, 2019 – was already provided to Turner in the form of a chart produced in discovery.  Treasury notes that the chart (doc. 45-6) was produced in 2019, and Turner has not disputed that statement.  The chart lists "Employees Impacted by Reorganization" and contains a column indicating whether the individual employee had "Prior EEO Activity."  (*Id.*)  Given that Turner was provided with the underlying information as part of discovery, the "repackaging" of the information into Watt's statement is not prejudicial.  Further, to the extent Turner argues that the information contained in the statement is overly vague, it was equally vague in the chart provided during discovery.  Turner had the opportunity to cure any uncertainty during the discovery process.  For the foregoing reasons, Turner's motion to strike the declaration of Lori Watt (doc. 42) is **DENIED**.

The Eleventh Circuit explained in *Babb II* that "[t]his court long ago construed § 2000e-16(a)'s prohibition of 'any discrimination' to directly 'bar[] reprisals against federal employees who file charges of discrimination.'"  992 F.3d at 1203 (quoting *Porter v. Adams*, 639 F.2d 273, 277-78 (5th Cir. Unit A Mar. 1981)).  The Eleventh Circuit further noted that it had already held in *Porter* that "retaliation for complaining about prohibited forms of discrimination is itself 'discrimination' within the meaning of § 2000e-16(a)."  *Id*.  Since retaliation is considered to be a form of prohibited discrimination, the *Babb* standard applies to Turner's claim of retaliation as well.  The question considered below is whether "retaliation 'play[ed] *any* part' in . . . the decision-making process" for any of Turner's proposed adverse employment actions.  *Buckley v. Sec'y of Army*, 97 F.4th 784, 798 (11th Cir. 2024) (quoting *Babb II*, 589 U.S. at 406) (emphasis in *Buckley*).  Unlike Turner's claims of race discrimination, she has submitted evidence to support a genuine issue of fact regarding a portion of her retaliation claim.

### 1.  Turner's 2016 Employment Appraisal

Turner received a "meets expectations" on her 2016 performance appraisal, despite being awarded an "exceeds expectations" appraisal with the same commentary the year before.  She argues that she should have at least received an "exceeds expectation" evaluation, commensurate with the year prior.  However, she notes that she had expected to receive an "outstanding" appraisal based on increased productivity for the 2016 year.  Prior to addressing whether Turner has alleged a question of fact regarding whether her 2016 performance appraisal was retaliatory, however, it must first be addressed whether she is foreclosed from bringing this claim due to her use of the grievance process put in place by the NTEU through collective bargaining.

Treasury argues that her retaliation claim, insofar as it relates to her 2016 performance appraisal, is barred.  (Doc. 46 at 10).  Federal employees and grievance procedures are governed by Title 5 of the United States Code.  (See 5 U.S.C. §§ 2101, 7121).  Section 7121(d) states:

> [a]n aggrieved employee affected by a prohibited personnel practice under section 2302(b)(1) of this title which also falls under the coverage of the negotiated grievance procedure may raise the matter under a statutory procedure or the negotiated procedure, but not both.  An employee shall be deemed to have exercised his option under this subsection to raise the matter under either a statutory procedure or the negotiated procedure at such time as the employee timely initiates an action under the applicable statutory procedure or timely files a grievance in writing, in accordance with the provisions of the parties' negotiated procedure, whichever event occurs first. . .

5 U.S.C. § 7121(d).  The Code of Federal Regulations reiterates that a federal employee who "is covered by a collective bargaining agreement that permits allegations of discrimination to be raised in a negotiated grievance procedure, a person wishing to file a complaint or a grievance on a matter of alleged employment discrimination must elect to raise the matter under either part 1614 or the negotiated grievance procedure, but not both."  29 C.F.R. § 1614.301(a).

Turner testified during her deposition that when she received the "meets expectations" appraisal she filed a grievance with the NTEU, following which her appraisal was changed from "meets" to "exceeds" expectations.  (Doc. 36-14 at 64:17-65:7).  She also filed an EEO Investigative Affidavit in which she confirmed that the "issue was brought to the Union as a grievance and resolved. . ." (Doc. 46-1).  Because Turner addressed her grievance regarding her 2016 performance appraisal with the collective bargaining grievance procedure through the NTEU, she is barred from asserting a claim regarding the appraisal in this matter.  *See Mohr v. Esper*, 5:18-cv-01628-HNJ, 2019 WL 8014316, at *10 (N.D. Ala. Aug. 19, 2019) ("Because Mohr pursued a claim regarding Hunt's email during her grievance proceeding, which she initiated prior

to filing an EEOC complaint, she cannot now pursue the claim in this court."); *see also Redmon v. Mineta*, 243 Fed. App'x. 920, 923-924 (6th Cir. 2007) ("A federal employee who suffers an adverse employment action and believes such action was discriminatory may challenge such adverse action in one of three ways.  The aggrieved employee may file a direct appeal of the adverse action to the MSPB [merit Systems Protection Board], file a grievance under his or her union's negotiated grievance procedure, or file a formal complaint with the EEOC [Equal Employment Opportunity Commission].  The aggrieved employee's election of any one of these three enumerated options precludes election of the other two." (quoting *Marbly v. Rubin*, 202 F.3d 269, 2000 WL 32009, at *2 (6th Cir. Jan. 4, 2000) (table) (unpublished) (internal citations omitted)).  Given the foregoing, Treasury's motion for summary judgment is due to be granted as to the portion of Turner's retaliation claim related to her 2016 employment appraisal.

## 2.  The Meeting "Callout"

Second, Turner asserts that she and Jackson were "called out" during a meeting as "troublemakers" and told not to sit together.  Treasury argues that the "callout" was a nonactionable, petty slight that does not rise to the level of an adverse employment action.  In her response to the motion for summary judgment, Turner does not address her retaliation claim as it relates to this incident.  (*See* Doc. 43 at 31-34).  As such, to the extent Turner intended to maintain that the "meeting callout" was retaliatory, she has abandoned the claim. *See Coalition for the Abolition of Marijuana Prohibition*, 219 F.3d at 1326; *Bush*, 2016 WL 324993, at *6; *Boyd*, 2014 WL 1245885, at *3; *Joseph ex rel. Joseph*, 2013 WL 3712334, at *5; *Hooper*, 482 F. Supp. 2d at 1334; *Hudson*, 209 F. Supp. 2d at 1324.  As discussed, *supra*, once the moving party shows an absence of genuine material fact to establish the existence of an element essential to the non-

moving party's case, it is up to the non-moving party to "go beyond the pleadings" to establish a "genuine issue for trial." *See Celotex*, 477 U.S. 322-324. (citation and internal quotation marks omitted). Since Turner failed to present any evidence supporting her assertion that the "callout" was an adverse employment action, the motion for summary judgment is due to be granted as to her claim that being called out as a "troublemaker" in the meeting was retaliatory.

### 3. Turner's Transfer to DPOD

Third and finally, Treasury argues that Turner failed to show a genuine issue of material fact regarding her retaliation claim for her transfer from AWG to DPOD. Treasury argues that the transfer was not an adverse employment action and that, even if it were, Turner cannot show a causal connection between the transfer and her protected action of testifying in Jackson's EEOC claim. As to whether the transfer can be considered an adverse employment action, Treasury argues that it was simply a lateral transfer to a new department and that because Turner did not lose pay or opportunities, and was not required to undertake a more arduous commute, it cannot be considered adverse. Turner argues that the transfer was an adverse action because the work in DPOD is more complicated and voluminous than in AWG.

Even a "lateral" transfer that involves a change in duties could constitute an adverse employment action as long as the employee can "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (citing *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (C.A.D.C. 2006)) (internal quotes and citations omitted). The plaintiff in *Burlington* argued that, even within the same job description, having her duties changed from duties that were

less arduous to primarily those that were more arduous and less desirable constituted an adverse

employment action.    The jury agreed and, ultimately, the Supreme Court upheld the jury's

determination.  *See Burlington*, 548 U.S. at 70-73.  The Supreme Court noted,

> To be sure, reassignment of job duties is not automatically actionable.  Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.

584 U.S. at 71. (internal quotes and citation omitted).

In this case, Turner was transferred to another department to perform a job she was

unfamiliar with and for which there is more work involved and the duties of the position are more

difficult.    Her analysis of the additional difficulty of the work in DPOD versus AWG was

corroborated by two other employees as well.  So, despite Treasury's insistence that a lateral move

in which the plaintiff did not lose pay, rank, or incur additional commute time could not possibly

be more than a petty grievance, the question remains one for the finder of fact.

Finally, Treasury argues Turner cannot show a causal relation between her transfer from

AWG to DPOD and her testimony in Jackson's EEOC complaint.  (Doc. 37 at 33-36).  Given the

evidence in the record – particularly the concern stated in emails between decision-makers about

having Turner and Jackson working in the same department following the reorganization and

Turner's testimony that she was told that she was being transferred as punishment – there is a

question of fact regarding the motivation of Turner's transfer from AWG to DPOD and whether

the decision was made "free from" retaliatory animus.    Although Treasury discounts the

implication of those emails by characterizing them as "attempts at preserving a previous

arrangement between employees" (doc. 37 at 35-36), this is simply an inference in its favor not

permitted at summary judgment.  *See Anderson*, 477 U.S. at 255.  Treasury also argues that because the reorganization happened in 2018 and Jackson's EEOC complaint was filed in 2016, the temporal distance between the two incidents precludes a finding of causation.  (Doc. 37 at 36). While it is true that temporal proximity *standing alone* would be insufficient to show causation when a large gap exists between the protective activity and the claimed retaliation, *see, e.g., Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006), given the circumstantial evidence raised by the emails, causation is a question for the finder of fact.

### IV. Conclusion

For the reasons set forth herein, Treasury's Motion for Summary Judgment [37] is due to be **GRANTED IN PART** and **DENIED IN PART**.  The motion is **GRANTED** as to (1) Turner's claim of race discrimination and (2) her claims of retaliation as they relate to her 2016 performance appraisal and being "called out" during the course of the team meeting.  The motion is **DENIED** as to Turner's claim of retaliation as it relates to her transfer from AWG to DPOD.

Treasury's motion to substitute the declaration of Sarah Ferree for that of Amanda Jackson (doc. 44) is **GRANTED**.  Turner's motion to strike the declarations of Sarah Ferree (substituted by that of Amanda Jackson) and Lori Watt is **DENIED**.

The parties are **ORDERED** to confer and to file a joint status report by **April 14, 2025,** concerning next steps in this case.  Specifically, the parties should indicate whether they believe magistrate-judge-led mediation would be beneficial.

DONE this 31st day of March, 2025.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE